**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| City of Aurora, an Illinois municipal corporation, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Case No. |
| ) | |
| Get Green Recycling Inc., GGR Real Estate, ) | |
| LLC, Get Green Appliance Recycling LLC, ) | |
| DIMCO GGR, LLC, Daniel R. Meyers, Anthony ) | |
| J. Meyers, James P. Meyers and Michael B. ) | |
| Meyers. ) | |
| Defendants. ) | |

## COMPLAINT

Now comes Plaintiff, CITY OF AURORA, ILLINOIS, an Illinois Home Rule Municipal Corporation (the "City" or "Aurora"), by its attorneys, Jeffery D. Jeep and Jeep & Blazer, LLC, and for its Complaint against Defendants, GET GREEN RECYCLING INC., GGR REAL ESTATE, LLC, GET GREEN APPLIANCE RECYCLING LLC, DIMCO GGR, LLC, DANIEL R. MEYERS, ANTHONY J. MEYERS, JAMES P. MEYERS AND MICHAEL B. MEYERS, states as follows.

## ALLEGATIONS COMMON TO ALL COUNTS

### Nature of Action

1.     This is a civil action for declaratory and injunctive relief, cost recovery and damages brought pursuant to: (1) Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6972, *et seq.*; (2) Section 107 of the Comprehensive Environmental

Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9607, *et seq.*; (3) Section 505 of the Clean Water Act ("CWA"), 33 U.S.C. §1365, *et seq.*; and (3) the Illinois common law of trespass and nuisance.

2.      Pursuant to Section 7002 of RCRA, 42 U.S.C. §6972, and Section 505 of the CWA, 42 U.S.C. §1365, the City has served a Notice of Intent to Sue ("NOITS") on Defendants. A copy of the NOITS, including its Exhibits A - I, consisting of 103 pages, is attached hereto as **Exhibit 1**.[1]

3.      This Complaint concerns (1) the disposal of solid waste or hazardous waste at the Get Green Recycling scrap metal operation (the "Site") and (2) the discharge of contaminated stormwater in violation of surface water effluent standards and limitations at and from the Site.

### Defined Terms

4.      "CWA" means the federal Clean Water Act (also known as the Federal Water Pollution Control Act), 33 U.S.C.A. § 1251 *et seq.*, including, § 1342, National Pollutant Discharge Elimination System ("NPDES").

5.      The term "CWA Violations" means the violations of the CWA described in ¶¶56 through 70 of this Complaint.

6.      The term "disposal" is defined in RCRA and CERCLA to mean the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may

---

[1]    This Complaint refers to exhibits to the NOITS as **Exhibit 1 [identifying letter(s)]**, e.g., E**xhibit 1-A**, **Exhibit 1-B**, etc. Some Exhibits to the NOITS also contain exhibits or attachments, which are referred to in a paranthesis, e.g., **Exhibit 1-A (Group Exhibit F)**(Photographs).

enter the environment or be emitted into the air or discharged into any waters, including ground waters." See RCRA, 42 U.S.C. § 6903(3) and CERCLA, 42. U.S.C. § 9601(29)

7.     The term "Effluent Standards" means the standards established by the IEPA for discharges of contaminants into the Waters of the State of Illinois in (1) 35 Ill. Adm. Code, Part 304, General Effluent Standards and (2) General Permit ILR00, including Section J.2, Benchmark Monitoring and Attachment 1, Scrap Recycling and Waste Recycling Facilities, Sector N, Section N.6, Table N-1.

8.     The term "General Permit ILR00" means General NPDES Permit No. ILR00 issued by the IEPA on April 5, 2017, for Stormwater Discharges from Industrial Activities available at https://www2.illinois.gov/epa/topics/forms/water-permits/storm-water/Pages/general-permits.aspx (last visited May 21, 2023).

9.     "IEPA" means the Illinois Environmental Protection Agency.

10.     The term "IEPA NPDES Website" means the IEPA website, Stormwater Notices of Intent Information for Construction and Industrial Activities, available at https://epa.illinois.gov/topics/forms/water-permits/storm-water/industrial-applicants.html     (last visited May 21, 2023).

11.     The term "NPDES Permit" means a National Pollutant Discharge Elimination System (NPDES) permit that is required by Section 1342 of the CWA, 33 U.S.C.A. § 1342(p)(3).

12.     The term "Search Warrant" refers to the Complaint For An Administrative Search Warrant that was filed by the City with the Circuit Court of Kane County, Illinois on November 15, 2022, enclosed as **Exhibit 1-C**, the Administrative Search Warrant that was issued by the Circuit Court on November 15, 2022 to collect soil, sediment and surface water samples at the

3

Site, enclosed as **Exhibit 1-D**, and the Administrative Search Warrants that were executed by the City on November 22, 2022 and December 13, 2022, enclosed as **Exhibits 2** and **3**, respectively.

13.    "TACO Standards" means the Tiered Approach To Corrective Action Objectives established by the IEPA, as authorized by Title XVII, Site Remediation Program, Illinois Environmental Protection Act, 415 ILSC 5/58 et. seq., and rules promulgated by the IEPA at 35 Ill. Adm. Code Part 742, Risk Based Cleanup Objectives.

14.    "USEPA" means the United States Environmental Protection Agency.

15.    The term "USEPA Scrap Metal Fact Sheet" means the USEPA's Final National Pollutant Discharge Elimination System Stormwater Multi-Sector General Permit for Industrial Activities, 60 FR 50804 (September 29, 1995), Section VII.N, Stormwater Discharges Associated with Industrial Activity from Scrap Recycling and Waste Recycling Facilities, 60 FR 50952 – 50970.

### The Site

16.    The Site is generally located at 540 and 600 North Broadway Avenue in Aurora, Illinois, and is generally bounded on the North by 610 North Broadway, Kane County tax parcel 15-15-451-029, on the East by the North Broadway Avenue, on the South by 512 North Broadway Avenue, Kane County tax parcel 15-22-201-001, and on the West by Kane County tax parcel 15-15-451-034. The Site consists of the following Kane County tax parcels:

   a.  15-15-451-030 with a common address of 600 N. Broadway Avenue (hereafter the "600 N. Parcel"),

   b.  15-15-451-033 with a common address of 540 N. Broadway Avenue,

   c.  15-15-453-001 with common addresses of 540 N. Broadway Avenue and 45, 55, and 59 Pierce Street,

   d.  15-15-453-002 with a common address of 540 N. Broadway Avenue (Kane County tax parcels 15-15-451-033, 15-15-453-001, and 15-15-453-002 are hereafter referred to collectively as the "540 N. Parcels").

4

17.     The 600 N. Parcel and the 540 N. Parcels are bisected by Pierce Street. The 600 N. Parcel and 540 N. Parcels (hereafter referred to collectively as the "Site") are shown on **Exhibit 1-A** (Site Map) and **Exhibit 1-Group B** (Aerial Photo).

18.     The Site includes locations where solid wastes, including contaminated stormwater and groundwater, emanating from the Site have, on information and belief, come to be located, or threaten to become located on properties adjacent to and in the vicinity of the Site, including North Broadway Avenue, Pierce Street, Kane County tax parcel 15-15-451-034, Kane County tax parcel 15-22-201-001, the City owned stormwater and sanitary sewers, and ultimately, the Fox River.

19.     On information and belief, scrap metal recycling operations began at the Site in 2011, or earlier.

20.     On information and belief, piles of scrap metal and other Solid Waste have continuously been stockpiled, stored or disposed of at the Site since 2011, or earlier.

21.     The Search Warrant contains photograhs that show piles of scrap metal and other Solid Waste that is stockpiled, stored or disposed of at the Site (**Exhibit 1-C** (**Group Exhibit F**) **(**Photographs).

22.     On information and belief, since 2011, or earlier, scrap metal recycling operations have released large quantities of dust, metal fines, residual particulate matter and solid waste that has been allowed to accumulate and been disposed at the Site.

23.     The residual particulate matter and solid waste that has been allowed to accumulate and been disposed at the Site is commonly referred to in the scrap metal industry as "Scrap Yard Soil Fill".

24.     On information and belief, since 2011, or earlier, a two to five-inch layer (or more) of Scrap Yard Soil Fill has been disposed across some or all of the Site.

25.     On information and belief, since 2011, or earlier, solid, toxic or hazardous waste has been disposed at the Site, including, but not limited to, Scrap Yard Soil Fill, special waste, oil, grease, used oil, oily water, lubricants, chemical residue, cutting oil, oil residue, coolants, antifreeze, glycol, fuel (gasoline, kerosene and diesel), hydraulic oil, transmission fluid, brake fluid, hazardous substances, hazardous materials, volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), polycyclic aromatic hydrocarbons, organic solvents, acetone, benzene, xylenes, methylene chloride, toluene, tetrachloroethene, trichloroethene, vinyl chloride, anthracene, benzo(a)pyrene, chrysene, fluoranthene, naphthalene, phenanthrene, pyrene, phenol, polychlorinated biphenyls ("PCBs"), switches, capacitors, insulation, asbestos (friable and non-friable), metals with painted and coated surfaces, fluorescent lights, ballasts, diagnostic equipment, engines, transmissions, motors, valves, gauges, sensors, tanks, piping, discarded cracked or damaged lead-acid batteries, and heavy metals, including iron, magnesium, cadmium, zinc, chromium, lead, nickel, mercury, and arsenic, (collectively "Solid Waste" or "Solid Waste Constituents").

26.     The CWA Violations may endanger the water quality of the Fox River on which the City of Aurora, other communities and their residents depend for potable water and for use as a natural resource for fishing, recreation and other activities.

27.     The above conditions at and around the Site are known to Defendants.

28.     In general terms, the City seeks to have Defendants held liable for the conditions at and around the Site, which may threaten human health, public safety and the environment. The City also seeks:

a. Injunctive relief under RCRA and common law compelling Defendants to abate the conditions at and around the Site and Solid Waste contamination they caused or contributed to, by their acts and omissions;

b. Recovery of response costs under CERCLA;

c. Compensatory damages;

d. Punitive damages for the willful and wanton conduct that has threatened, and continues to threaten, the safety of the City's residents; and

e. Recovery of the City's attorneys' fees, expert costs and costs of suit under RCRA.

29. In general terms, the City also seeks to have Defendants held liable for the continuing CWA Violations at the Site. The City also seeks:

a. A declaratory judgment that the Defendants have violated and continue to be in violation of the CWA;

b. Injunctive relief against the Defendants to abate the continuing CWA Violations;

c. An Order that the Defendants pay civil penalties for each day of CWA Violations committed by them;

d. Recovery of the City's attorneys' fees, expert costs and costs of suit under the CWA.

**Jurisdiction and Venue**

30. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 42 U.S.C. §6972(a), 42 U.S.C. 9607(a), 42 U.S.C. §9613(g)(2) and 33 U.S.C. §1365 because this case arises under the laws of the United States. Specifically, Counts I, II and III are predicated upon and seek relief pursuant to RCRA, CERCLA and the CWA, respectively.

31. This Court has supplemental jurisdiction over the State and local law claims herein pursuant to 28 U.S.C. §1367, in that said claims are so related to the RCRA, CERCLA and CWA

claims that they form part of the same case or controversy under Article III of the U.S. Constitution. The claims in Counts IV - VI are predicated upon and seek relief pursuant to the common law of trespass and nuisance, including punitive damages related to the willful and wanton conduct of the Defendants.

**The Parties**

32.     The City is an Illinois home rule municipal corporation.

33.     Get Green Recycling Inc. ("GGR") was incorporated as an Illinois corporation on April 9, 2010 and has been assigned File Number 67459164 by the Illinois Secretary of State ("ILSOS"). Since April 18, 2013, GGR has also conducted business under the assumed corporate name of Get Green Technologies, Inc. On information and belief, GGR is also doing business as Get Green Recycling Co. and Get Green Recycling Company. See GGR's website at http://www.getgreencorp.com (last visited May 21, 2023).

34.     Get Green Recycling, LLC was formed as an Illinois limited liability company on April 22, 2010 and has been assigned File Number 02971704 by the ILSOS. On June 23, 2010, Get Green Recycling, LLC changed its name to GGR Real Estate, LLC ("GGR Realty").

35.     Get Green Appliance Recycling, LLC ("GGR Appliance") was formed as an Illinois limited liability company on February 26, 2016 and has been assigned File Number 05595657 by the ILSOS. On August 9, 2019, the ILSOS involuntarily dissolved the company for failure to file a 2019 Annual Report.

36.     DIMCO GGR, LLC ("DIMCO") was formed as an Illinois limited liability company on October 16, 2019 and has been assigned File Number 08172013 by the ILSOS. On information and belief, DIMCO is an abbreviation for Dekalb Iron & Metal Company.

37.     Daniel R. Meyers, a/k/a "Danny" Meyers ("D. Meyers") is an individual residing at 9065 Edinburgh CT, Village of Lakewood, IL.

38.     Anthony J. Meyers, a/k/a "Tony" Meyers ("A. Meyers") is an individual residing at 6825 W. Golfview Lane, Palos Heights, IL.

39.     James P. Meyers, a/k/a "Jimmy" Meyers ("J. Meyers") is an individual residing at 3014 N. Racine Ave., 1st Floor, Chicago, IL.

40.     Michael B. Meyers, a/k/a "Mike" Meyers ("M. Meyers") is an individual residing at 1900 Reckinger Road, Aurora, IL.

41.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers are brothers.

## Ownership and Operating History

42.     On information and belief, in April 2011, or earlier, GGR and GGR Realty began scrap metal recycling operations at the Site.

43.     On information and belief, in February 2016, GGR Appliance joined in scrap metal recycling operations at the Site.

44.     On information and belief, in October 2019, DIMCO joined in scrap metal recycling operations at the Site.

45.     On information and belief, since 2011, or earlier, D. Meyers has exercised authority and control over, actively participated in and was personally involved in the management and decision-making of GGR, GGR Realty, GGR Appliance, DIMCO, and the Site.

46.     On information and belief, since 2011, or earlier, A. Meyers has exercised authority and control over, actively participated in and was personally involved in the management and decision-making of GGR, GGR Realty, GGR Appliance, DIMCO, and the Site.

47.     On information and belief, since 2011, or earlier, J. Meyers has exercised authority and control over, actively participated in and was personally involved in the management and decision-making of GGR, GGR Realty, GGR Appliance, DIMCO, and the Site.

48.     On information and belief, since 2011, or earlier, M. Meyers has exercised authority and control over, actively participated in and was personally involved in the management and decision-making of GGR, GGR Realty, GGR Appliance, DIMCO, and the Site.

49.     On information and belief, D. Meyers has been the President of GGR since the corporation was incorporated on April 9, 2010.

50.     On information and belief, D. Meyers has been the Manager of GGR Realty, GGR Appliance, and DIMCO since the companies were formed on April 22, 2010, February 26, 2016, and October 16, 2019, respectively.

51.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers, own stock, or membership interests in GGR, GGR Realty, GGR Appliance, and / or DIMCO.

52.     On information and belief, on February 11, 2016, Triangle Plaza Inc, an Illinois corporation, IL SOS File No. 40636986, as successor by merger with Aurora Ward Lumber Company, a South Dakota corporation, ILSOS File No. 08292562, conveyed the 540 N. Parcels to GGR Realty. See Kane County Recorder Instrument No. 2016K006899. On information and belief, the February 11, 2016 conveyance also included (a) an easement interest in Kane County tax parcel 15-451-034 (common address of 45 E. Pierce Street), and (b) an easement interest in Pierce Street (a City owned right of way).

53.     On information and belief, on or before 2011, Triangle Plaza Inc., Aurora Ward Lumber Company, or a person presently unknown to the City, leased the 540 N. Parcels to GGR Realty or GGR, or both.

10

54.     On information and belief, on November 16, 2018, Aries Real Estate, LLC, an Illinois Limited Liability Company, ILSOS File No. 05052615, conveyed the 600 N. Parcel to GGR Realty. See Kane County Recorder Instrument No. 2018K055810.

55.     On information and belief, on November 13, 2018, GGR Realty leased the 600 N. Parcel to GGR with a lease term running from December 1, 2018 through December 1, 2043. See Kane County Recorder Instrument No. 2018K055813.

**The CWA Violations**

56.     The Site discharges stormwater to the Fox River via (1) a storm sewer that is located within Illinois Route 25 (N. Broadway Avenue) and (2) unimproved stormwater channels that are located to the west and adjacent to the Site.

57.     The scrap metal recycling operations that GGR and GGR Realty have conducted at the Site since 2011, or earlier, that GGR Appliance has conducted at the Site since 2016, and that DIMCO has conducted at the Site since 2019, constitute an industrial activity for which a NPDES Permit is required. See also General Permit ILR00, p. 3, 5 (permit applies to metal scrapyards, battery reclaimers, salvage yards, and automobile junkyards including Standard Industrial Classifications 5015 (Used motor vehicle parts) and 5093 (Scrap and waste materials)).

58.     Since 2011, and continuing to the present, the City has issued Violation Notices to GGR Realty and GGR for violations of the City Code, including conducting scrap metal operations at the Site outdoors and on City owned property without the permission of the City, namely on (a) Pierce Street, a City owned right of way, (b) Kane County tax parcel 15-15-451-034 (with a common address of 45 E. Pierce Street), and (c) Kane County tax parcel 15-22-201-001 (with a common address of 512 N. Broadway).

59.     On September 17, 2021, John Wills, PE CPESC, with JJW Engineering, the City's consultant, issued a report on his inspection of the Site, which is attached as **Exhibit 1-H**. Wills concluded, *inter alia*, (a) that scrap metal operations were conducted on the Site without an NPDES permit; and (b) that the manhole cover on the City's sanitary sewer on the Site was pulled back such that stormwater could enter the City's sanitary sewer. Wills also observed stockpiles of scrap metal outdoors at the Site that were exposed to precipitation and stormwater.

60.     Wills reached the same conclusions in his June 22, 2022 report, which is attached as **Exhibit 1-I**.

61.     A search of the online database on the IEPA NPDES Website confirms that a Notice of Intent to be covered under General Permit ILR00 has not been submitted to the IEPA for the Site.

62.     On information and belief, neither GGR, GGR Realty, GGR Appliance, nor DIMCO, have applied to the IEPA or to the USEPA for an individual NPDES permit for the Site.

63.     The purpose of General Permit ILR00 and individual NPDES permits is to prohibit discharges that cause or contribute to violations of water quality standards. Water quality standards are the foundation of the federal Clean Water Act and the IEPA's efforts to protect the Waters of the State of Illinois, including the Fox River. Water quality standards represent the USEPA and IEPA's determination, based on scientific studies, of the thresholds at which pollution starts to cause significant adverse effects on aquatic life or other beneficial uses. For each water body in Illinois, including the Fox River, the IEPA designates the "beneficial uses" that must be protected through the adoption of water quality standards.

64.     The USEPA Scrap Metal Fact Sheet explains in detail the reasons that scrap metal operations present a threat to water quality. Sector N in General Permit ILR00 is based on the

findings made by USEPA in their Scrap Metal Fact Sheet, Subpart N – Sector N – Scrap Recycling and Waste Recycling Facilities, 60 FR at 50952 – 50970.

65. The USEPA Scrap Metal Fact Sheet describes the activities inherent in scrap metal recycling operations that endanger water quality and contribute to the disposal of Solid Waste, including, but not limited to, the following:

a. Scrap metal recyclers receive a diverse mix of materials that are not pre-screened and arrive "as is".

b. The scrap metal is accepted without inspection.

c. The scrap metal contains switches, capacitors, insulation, asbestos (friable and non-friable), radioactive material, metallic fines, painted and coated surfaces, and component parts (such as fluorescent lights, ballasts, diagnostic equipment, engines, transmissions, motors, valves, gauges, sensors, tanks and piping).

d. Cracked or damaged lead-acid batteries spill their contents on to soil and into stormwater.

e. The scrap metal arrives containing a variety of liquids, such as oil, solvents (e.g., trichloroethylene and benzene), lubricants, chemical residue, cutting oil, oil residue, coolants, antifreeze, fuel (gasoline, kerosene, and diesel), hydraulic oil, transmission fluids, brake fluid, and polychlorinated biphenyls (PCBs).

f. Scrap metal recyclers process the scrap metal with enormous physical force (e.g., shearing, shredding, compacting, and baling) which releases large quantities of dust and metal fines into the air that settles onto soil and is released with stormwater.

g. Scrap metal recyclers conduct operations outdoors.

h. Scrap metal recyclers stockpile scrap metal before, during and after processing.

i. The processing and stockpiling of scrap metal are performed outdoors on unpaved soil.

j. Scrap metal corrodes, releasing a variety of metals to soil and stormwater, including magnesium, cadmium, zinc, chromium, lead, nickel, mercury, and arsenic.

k. Trucks, forklifts, shredders, and other ancillary equipment spill and release oil, fuel and other contaminants to soil and stormwater.

13

66. The stormwater from the Site contains high concentrations of total suspended solids that are produced by the scrap metal operations (e.g., dust and metal grindings) that fall upon outdoor surfaces at the Site. The soil at the Site has a grain size comparable to sand and silt, which results in contaminated soil migrating from the Site (as sediment) into the environment through stormwater runoff and windborne erosion.

67. In addition to the contaminants listed in **Table 1** (¶75 below), and because the scrap metal operations at the Site involve some or all the activities described in the USEPA Scrap Metal Fact Sheet, on information and belief, the contaminants released into stormwater at the Site include, by way of example, the following:

   a. The sediments and dissolved chemicals that have a high chemical oxygen demand;

   b. Nitrogen;

   c. PCBs;

   d. Metals not listed in **Table 1** (¶75 below) (e.g., arsenic);

   e. Oil and grease that is released by the machinery that is used at the Site, including trucks, lifts, cranes, shredders, metal cutters and presses; and

   f. Hazardous materials that are spilled at the Site, including, oils, solvents, petroleum, fuel, coolants, and hydraulic fluids.

68. General Permit ILR00 and the CWA require that the Site implement measures to address the inherent risks to water quality presented by scrap metal operations (as described in the USEPA Scrap Metal Fact Sheet), including the following:

   a. That the Site apply all known and reasonable methods for the prevention, control, and treatment of pollution that are designed to ensure that the stormwater discharged from the Site meets Effluent Standards, including requiring that the Site prepare and implement following plans:

      i. A Stormwater Pollution Prevention Plan,

      ii. A Best Management Practices Plan, and

14

iii.   A Spill Control and Countermeasures Plan;

b.   That the Site monitor stormwater discharges to ensure compliance with Effluent Standards;

c.   That the Site monitor the stormwater discharges for the concentrations of contaminants that caused the IEPA to designate the Fox River an "impaired" waterbody;

d.   That the Site treat stormwater as necessary to meet Effluent Standards;

e.   That the Site certify that the stormwater leaving the Site does not contain spilled liquid wastes (such as petroleum products);

f.   That the Site train employees;

g.   That the Site conduct regular site inspections; and

h.   That the Site take corrective action to address conditions that may cause the exceedance of Effluent Standards.

69.   The Site has not implemented the stormwater controls required by General Permit ILR00 and the CWA to minimize the discharge of contaminants associated with scrap metal operations. Each occurrence of rainfall and snowmelt causes contaminants in soil at the Site to migrate to the Fox River (1) through surficial soils to shallow bedrock that is hydraulicly connected to the Fox River; and (2) as sediment in stormwater runoff and windborne erosion.

70.   The Defendants continue to cause or allow the operation of the Site to be in violation of the CWA. This violation has occurred on each and every day since the industrial activity commenced on the Site in 2011, or earlier, and continue to occur every day that scrap metal operations continue at the Site without GGR, GGR Realty, GGR Appliance, or DIMCO, submitting a Notice of Intent to be covered under General Permit ILR00, or having secured an individual NPDES permit for the Site.

**The Disposal of Solid Waste**

71.     The scrap metal operations have caused, and continue to cause, the disposal of Solid Waste at the Site.

72.     On November 22, 2022, pursuant to the Search Warrant and on behalf of the City, representatives of Carlson Environmental and JJW Engineering, the City's consultants, inspected the Site, and the Carlson Environmental representative collected soil samples at the Site. A map depicting the location where the samples were collected at the Site, and the laboratory analysis of the samples that was issued by Microbac Laboratories, Inc. on December 22, 2022, are enclosed as **Exhibits 1-F** and 1-**G**, respectively.

73.     The purpose of the TACO Standards, among others, is to establish levels of contamination in soil that, if not remediated, are deemed by the IEPA to endanger human health and the environment.

74.     The December 22, 2022 laboratory analysis confirms that the scrap metal operations have caused the disposal of Solid Waste on the Site and caused soil contamination to exceed the TACO Standards.

75.     **Table 1**, below, identifies the contaminants in the soil sample that was collected on November 22, 2022 at location R0-2 that exceed one or more of the TACO Standards for Residential Properties:

| Contaminant | R0-2[2] |
|---|---|
| Antimony[3] | x |

---

[2]    For the location of the soil sample R0-2 and the laboratory analysis, see **Exhibits 1-F** and **1-G**, respectively.

[3]    An "x" denotes that the contaminant is present in soil in exceedance of one or more of the TACO Standards for Residential Properties. See 35 Ill. Adm. Code 742.Appendix B, Table A.

16

| | |
|---|---|
| Chromium | x |
| Iron | x |
| Lead | x |
| Mercury | x |
| Nickel | x |

76.    Soil sample location R0-2 is located at the Southwest corner of the Site, on Kane County tax parcel 15-15-451-033. Stormwater flows variably from location R0-2 (1) west onto Kane County tax parcel 15-15-451-034 and (2) south onto Kane County tax parcel 15-22-201-001. The City owns Kane County tax parcels 15-15-451-034 and 15-22-201-001.

### Defendants Caused or Allowed the CWA Violations and Disposed of Solid Waste

77.    On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers oversaw or currently oversee the development and implementation of scrap metal recycling policies and procedures for the Site, made or make decisions concerning when and whether to conduct disposal of Solid Waste at the Site, and made or make decisions concerning when and whether to comply with the CWA.

78.    On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers drafted or draft, or participated or participate in the drafting of policies and procedures for the Site, including policies and procedures for accepting, rejecting, storing, treating, disposing, processing, and transshipping scrap metal.

79.    On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers designed, oversaw, participated in and reviewed, or continue to design, oversee, participate in and review self-audit procedures at the Site.

80.    On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers participated or participate in day-to-day decision-making concerning operations at the Site.

81.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers negotiated or negotiate contracts with persons that sell, transport, or otherwise arrange for the delivery of scrap metal to the Site.

82.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers negotiated or negotiate contracts with facilities to which solid waste or scrap metal was or is transshipped from the Site for treatment, storage, disposal, recycling, or reuse.

83.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers negotiated or negotiate with government agencies regarding authorizations, approvals, consents, and agreements relating to scrap metal operations at the Site.

84.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers signed applications for permits, authorizations, statements, reports, complaints, and other communications submitted to the City or other regulatory authorities.

85.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers held or hold themselves out to the City and other regulatory authorities as the owner(s), officer(s), manager(s) or operator(s) of the Site or the person(s) in charge of the Site.

86.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers were or are present when the City or other regulatory authorities conducted or conduct inspections of the Site, responded to or respond to questions and provided or provide information at, and in follow-up to, such inspections.

87.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers were or are responsible for selecting, communicating with, and managing consultants who performed or perform work at the Site.

88.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers directed, controlled, hired, disciplined, fired, and supervised, or direct, control, hire, discipline, fire, and supervise employees at the Site.

89.     On information and belief, D. Meyers, A. Meyers, J. Meyers, and M. Meyers made or make, or participated or participate in, all important financial decisions involving the Site.

## COUNT I
## RCRA INJUNCTION AGAINST DEFENDANTS

1-89.   The City adopts and re-alleges paragraphs 1 through 89 of the Allegations Common to all Counts as Paragraphs 1 through 89 of this Count I.

90.     42 U.S.C. §6972 confers upon any person the right to file suit:

> (B) against any person ... or past or present owner or operator of a ... facility ... who has contributed or who is contributing to the past or present handling, storage, treatment ... or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

91.     The City is a "person" under §6903(15) of RCRA.

92.     Defendants are "persons" under §6903(15) of RCRA.

93.     On information and belief, during the period of time Defendants owned or operated the Site, or exercised authority and control over the Site, the conditions at the Site have caused, or threatened to cause, the disposal of Solid Waste, including contaminated stormwater, at and around the Site.

94.     The conditions at the Site have caused and threaten to cause solid or hazardous wastes or hazardous substances, including contaminated stormwater, to be disposed at and around the Site.

19

95.     On information and belief, because of the conditions at the Site, including the disposal of a two to five-inch layer (or more) of Scrap Yard Soil Fill across some or all of the Site, the Site may present an imminent and substantial endangerment to health or the environment.

96.     On information and belief, the two to five-inch layer (or more) of Scrap Yard Soil Fill across some or all of the Site constitutes an open dump, as the term "open dump" is defined in RCRA, 42 U.S.C. §6903(14).

97.     The Defendants have caused or contributed to the conditions at the Site that may present an imminent and substantial endangerment to health or the environment.

98.     On one or more occasions, the particulars of which are not presently known to the City, but occurring as early as 2011 or earlier, and as recently as the present, the Defendants have caused or allowed the disposal of a solid or hazardous waste, including contaminated stormwater, within the meaning of RCRA, 42 U.S.C. § 6901, et seq.

99.     As a consequence of such disposal, the Site and surrounding areas have become contaminated by, or are threatened to be contaminated by, solid or hazardous wastes or hazardous substances, including contaminated stormwater.

100.    The Defendants have contributed to or are contributing to the past or present handling, storage or disposal of substances which are solid waste or hazardous waste at and around the Site, including contaminated stormwater, which may present an imminent and substantial endangerment to health or the environment, within the meaning of 42 U.S.C. § 6972(a)(1)(B).

101.    The Site may present an imminent and substantial endangerment to health or the environment, within the meaning of 42 U.S.C. § 6972(a)(1)(B).

102.    In accordance with 42 U.S.C. §6972 and 40 C.F.R. § 254.2, on January 26, 2023, the City sent the NOITS, via registered mail with return receipt requested, to Get Green Recycling

20

Inc., GGR Real Estate, LLC, Get Green Appliance Recycling LLC, DIMCO GGR, LLC, Daniel R. Meyers, Anthony J. Meyers, James P. Meyers, Michael B. Meyers, the Administrator of the USEPA, the USEPA Region 5 Administrator, the U.S. Attorney General and the Director of the IEPA. Copies of the proofs of service via Registered Mail and Special Process Server are attached hereto as **Group Exhibit 4**.

103.    Since the issuance of the NOITS, no action has been taken by the USEPA Administrator, the USEPA Region 5 Administrator, the U.S. Attorney General or the IEPA Director, which would preclude the City from pursuing a claim under RCRA Section 7002(a)(1)(B).

104.    Pursuant to 42 U.S.C. §6972(b)(2)(F), a copy of this Complaint will be served upon the U.S. Attorney General and the USEPA Administrator.

WHEREFORE, the City prays for judgment in its favor and against the Defendants as follows:

A.    For a declaration that the Defendants are jointly and severally liable for the subject contamination under 42 U.S.C. §6972 of RCRA;

B.    For injunctive relief restraining and enjoining the Defendants from disposing of Solid Waste at and around the Site, including contaminated stormwater, and compelling Defendants to take any and all actions necessary to abate the conditions at and around the Site that may present an imminent and substantial endangerment to health or the environment;

C.    For injunctive relief restraining and enjoining the Defendants from taking any actions in violation of RCRA and the regulations promulgated or authorized thereunder;

21

D.    For an award of the City's attorneys' fees, expert costs and costs of suit; and

E.    For such further relief as this Court deems appropriate.

## COUNT II
## COST RECOVERY AND DECLARATORY JUDGMENT UNDER CERCLA

1-89.    The City adopts and realleges paragraphs 1 through 89 of the Allegations Common to All Counts as Paragraphs 1 through 91 of this Count II.

90.    CERCLA Section 107(a), 42 U.S.C. 9607(a), provides, in pertinent part, that the following persons are liable for response costs which are consistent with the National Contingency Plan, 40 C.F.R. Part 300, and which have been incurred by the City as result of a release or threatened release of hazardous substances from a facility:

a.  the [current] owner or operator of ... [the] facility,

b.  any person who at the time of disposal of any hazardous substance owned or operated [the] facility ....

91.    Each of the Defendants falls within the class of persons described in §§107(a)(1) or 107(a)(2), or both, of CERCLA, 42 U.S.C. §§9607(a)(1) and (a)(2).

92.    The Site, and all locations where Solid Waste has come to be located, are collectively a "facility" (the "Facility") within the meaning and scope of CERCLA Sections 109(9) and 107(a), 42 U.S.C. §§9601(9) and 9607(a).

93.    The City is informed and believes that the Solid Waste, including contaminated stormwater, is a hazardous substance within the meaning and scope of CERCLA Sections 101(14) and 107(a), 42 U.S.C. §§ 9601(14) and 9607(a).

94.   Disposal of Solid Waste, including contaminated stormwater, occurred at the Facility during the times when Defendants owned or operated the Facility, within the meaning and scope of CERCLA Sections 101(29) and 107(a), 42 U.S.C. §§9601(29) and 9607(a).

95.   There have been releases or the threat of releases of hazardous substances, including contaminated stormwater, into the environment at or from the Facility, within the meaning and scope of CERCLA Section §101(22), 42 U.S.C. 9601(22).

96.   The actual and threatened "releases" of hazardous substances from the Facility, including contaminated stormwater, have caused the City to incur "response costs" within the meaning and scope of CERCLA Sections 101(25) and 9607(a), 42 U.S.C. §§9601(25) and 9607(a).

97.   The City has incurred, and will continue to incur, response costs in connection with the investigation of the Solid Waste at the Facility, including contaminated stormwater, and potential remedial actions, including, but not limited to, costs for design of removal and remedial actions at the Facility. The response costs incurred by the City are consistent with the National Contingency Plan, 40 C.F.R. Part 300.

98.   GGR Realty and GGR are a current owners of the Facility, or at the time of disposal were an owner of the Facility, within the meaning and scope of CERCLA Sections 107(a)(1) and (a)(2), 42 U.S.C. §§9607(a)(1) and (a)(2)(c).

99.   GGR, GGR Realty, GGR Appliance, DIMCO, D. Meyers, A. Meyers, J. Meyers, and M. Meyers were or are operators of the Facility within the meaning and scope of CERCLA Sections 107(a)(1) and (a)(2), 42 U.S.C. §§9607(a)(1) and (a)(2).

100.  The Defendants are jointly and severally liable to the City, pursuant to CERCLA Section 107(a), 42 U.S.C. 9607(a), for all response costs incurred by the City in connection with the Facility, including (without limitation) pre-judgment interest.

23

101.    Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. §9613(g)(2), the City is also entitled to a declaratory judgment, binding on any subsequent action to recover further response costs relating to the Facility, including removal and remedial actions, that the Defendants are jointly and severally liable for such costs.

WHEREFORE, the City prays for judgment in its favor and against the Defendants as follows:

A.    That, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are jointly and severally liable for response costs incurred by the City;

B.    For a declaration, pursuant to CERCLA Section 113(g)(2), 42 U.S.C. §9613(g)(2), binding on any subsequent action to recover further response costs relating to the Facility, including removal and remedial actions, that the Defendants are jointly and severally liable for such costs pursuant to Section 107(a) of CERCLA, 42 U.S.C. §9607(a); and

C.    For such further relief as this Court deems appropriate.

## COUNT III
## CWA INJUNCTION AGAINST DEFENDANTS

1-89.    The City adopts and realleges paragraphs 1 through 89 of the Allegations Common to All Counts as Paragraphs 1 through 91 of this Count III.

90.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants by any person, unless in compliance with the provisions of the CWA. Section 301(a) prohibits, *inter alia*, such discharges not authorized by a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

24

91.     The State of Illinois has established a federally approved state NPDES program administered by the IEPA. 415 ILCS 5/12.5; 35 Ill. Adm. Code 309.101, et seq. The Illinois program has been approved by the Administrator of the USEPA pursuant to 33 U.S.C. §1342(b).

92.     The CWA Violations continued after the 540 N. Parcels were conveyed to GGR Realty on February 11, 2016 and after the 600 N. Parcel were conveyed to GGR Realty on November 16, 2018.

93.     The CWA Violations continued after the 540 N. Parcels were leased to GGR Realty or GGR, or both, on or before 2011 and after the 600 N. Parcel was leased to GGR on November 13, 2018.

94.     The CWA Violations continued after GGR Appliance commenced operations at the Site in 2016.

95.     The CWA Violations continued after DIMCO commenced operations at the Site in 2019.

96.     Upon information and belief, the CWA Violations are ongoing or are reasonably likely to continue to occur.

97.     GGR, GGR Realty, GGR Appliance, DIMCO, D. Meyers, A. Meyers, J. Meyers, and M. Meyers have benefited economically as a consequence of the CWA Violations and its failure to abate the CWA Violations.

98.     The CWA Violations described herein and in the NOITS constitute violations of sections 301 and 402 of the CWA, 33 U.S.C. §§1311 and 1342, and violations of "effluent standard(s) or limitation(s)" within the meaning of Section 505 of the CWA, 33 U.S.C. §1365.

99.     In accordance with 33 U.S.C. §1365 and 40 C.F.R. § 135.2, on January 26, 2023, the City sent the NOITS, via registered mail with return receipt requested, to Get Green Recycling

Inc., GGR Real Estate, LLC, Get Green Appliance Recycling LLC, DIMCO GGR, LLC, Daniel R. Meyers, Anthony J. Meyers, James P. Meyers, Michael B. Meyers, the Administrator of the USEPA, the USEPA Region 5 Administrator, the U.S. Attorney General and the Director of the IEPA. Copies of the proofs of service via Registered Mail and Special Process Server are attached hereto as **Group Exhibit 4**.

100.    Since the issuance of the NOITS, no action has been taken by the USEPA Administrator, the USEPA Region 5 Administrator, the U.S. Attorney General or the IEPA Director, which would preclude the City from pursuing a claim under the CWA Section 1365(b)(1)(B).

101.    Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendants are likely to continue the CWA Violations to the further injury of the City, its residents, and other communities and their residents that depend on the Fox River for potable water and use as a natural resource for fishing, recreation and other activities.

102.    Pursuant to 33 U.S.C. §1365(c)(3), a copy of this Complaint will be served upon the U.S. Attorney General and the USEPA Administrator.

WHEREFORE, the City prays for judgment in its favor and against the Defendants granting the following relief:

        A.    For a declaratory judgment that the Defendants have violated and continues to be in violation of ILR00, ILR001780, the SWPPP and Sections 301 and 402 of the CWA, 33 U.S.C. §§1311 and 1342;

        B.    For an order enjoining the Defendants from operating the Site in a manner that results in further CWA Violations;

C.      For an order directing the Defendants to immediately implement a SWPPP that is in compliance with General Permit ILR00 and the CWA;

D.      For an order directing the Defendants to pay civil penalties of $25,500.00 per day of violation for each violation committed by the Defendants pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§1319(d) and 1365(a), with an adjustment of the amount of statutory civil penalties for inflation, as provided by 40 C.F.R. § 19.1 *et seq.*; and

E.      For such further relief as this Court deems appropriate.

## COUNT IV
## TRESPASS

1-89.      The City adopts and realleges paragraphs 1 through 89 of the Allegations Common to All Counts as paragraphs 1 through 91 of this Count IV.

90.      Defendants have caused and allowed, and continue to cause and allow, Solid Waste, including contaminated stormwater, to be disposed at and around the Site, including into the soil, structures and air in, on and above property owned by the City, including North Broadway Avenue, Pierce Street, Kane County tax parcel 15-15-451-034, Kane County tax parcel 15-22-201-001, rights-of-way owned by the City, the City's stormwater sewer, and the City's sanitary sewer.

91.      Defendants did not have permission, authority or right to allow Solid Waste, including contaminated stormwater, to enter upon the property owned by the City, and the migration of contaminants onto property owned by the City is unlawful and without the consent of the City.

92.      Notwithstanding Defendants' knowledge that conditions at and around the Site were causing, or threatening to cause, Solid Waste, including contaminated stormwater, from the

Site to migrate and enter onto property owned by the City, contaminating the soil, structures and air in, on and above property owned by the City, and despite demand by the City, Defendants have failed to abate the conditions at and around the Site and have otherwise failed to remove or remediate the contamination on the City owned property and to prevent the ongoing migration and entry of Solid Waste, including contaminated stormwater, onto property owned by the City.

93.     With knowledge of the conditions at the Site, and that Solid Waste, including contaminated stormwater, originating from the Site has migrated and entered, and continues to migrate and enter, onto property owned by the City, contaminating the soil, structures and air in, on and above property owned by the City, Defendants have willfully and wantonly failed, despite demand by the City, to abate the conditions at the Site and prevent such migration and entry of contaminants onto property owned by the City.

94.     Defendants' willful and wanton actions and omissions have interfered with and continue to interfere with the City's property rights.

95.     Defendants' willful and wanton actions and omissions have caused, and will continue to cause damage to the City, including, but not limited to, unreimbursed expenses and costs and other violations of the City's rights as owner of its property.

WHEREFORE, the City prays for judgment in its favor and against Defendants as follows:

A.     For injunctive relief restraining and enjoining the Defendants from allowing Solid Waste, including contaminated stormwater, to be disposed at and around the Site, including City owned property, and compelling Defendants to take any and all actions necessary to abate conditions at and around the Site causing Solid Waste, including contaminated stormwater and groundwater, to contaminate City owned property;

28

B.    For an award of compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

C.    For an award of punitive damages in an amount deemed appropriate by this Court; and

D.    For such further relief as this Court deems appropriate.

**COUNT V**
**PRIVATE NUISANCE**

1-89.    The City adopts and realleges paragraphs 1 through 89 of the Allegations Common to All Counts as paragraphs 1 through 91 of this Count V.

90.    Defendants have caused and allowed, and continue to cause and allow, Solid Waste, including contaminated stormwater, to be disposed at and around the Site, including into the soil, structures and air in, on and above property owned by the City, including North Broadway Avenue, Pierce Street, Kane County tax parcel 15-15-451-034, Kane County tax parcel 15-22-201-001, rights-of-way owned by the City, the City's stormwater sewer, and the City's sanitary sewer.

91.    The actions and omissions of Defendants constitute a nuisance, which has substantially interfered with the City's use and enjoyment of City owned property.

92.    The actions and omissions of Defendants have caused and will continue to cause damage to the City, including but not limited to unreimbursed expenses and costs, and other violations of the City's property rights as owner of property.

93.    During the period of time that the Defendants owned or operated the Site, or exercised authority and control over the Site, Defendants had actual knowledge that the conditions at the Site caused, and threaten to cause, Solid Waste, including contaminated stormwater, to be

29

disposed at and around the Site, and, in willful and wanton disregard of public health and safety, and despite demand by the City, failed to take action to abate the conditions at the Site.

94.     As a consequence of Defendants' willful and wanton acts and omissions, these conditions at the Site have caused Solid Waste, including contaminated stormwater, to be disposed at and around the Site, presenting a serious risk to public health and safety.

95.     Defendants' willful and wanton actions have caused and will continue to cause damage to the City, including but not limited to unreimbursed expenses and costs, and other violations of the City's property rights as owner of property.

WHEREFORE, the City prays for judgment in its favor and against Defendants as follows:

A.     For injunctive relief restraining and enjoining the Defendants from allowing Solid Waste to be disposed at and around the Site, including City owned property, and compelling Defendants to take any and all actions necessary to abate conditions at and around the Site;

B.     For an award of compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

C.     For an award of punitive damages in an amount deemed appropriate by this Court; and

D.     For such further relief as this Court deems appropriate.

**COUNT VI**
**PUBLIC NUISANCE**

1-89.   The City adopts and realleges paragraphs 1 through 89 of the Allegations Common to All Counts as paragraphs 1 through 91 of this Count VI.

90.     Defendants' willful and wanton actions and omissions have resulted in a public nuisance, which unreasonably interferes with the public's rights to the use and enjoyment of facilities within the City and with the public's right to be free from exposure to the dangers associated with Solid Waste, including contaminated stormwater.

91.     Notwithstanding Defendants' knowledge that conditions at the Site cause Solid Waste to be disposed at and around the Site, Defendants have willfully and wantonly failed to abate the conditions at and around the Site and, despite demand by the City, have failed to abate the conditions at the Site, placing the general public at risk of exposure to Solid Waste, including contaminated stormwater.

92.     Defendants' willful and wanton actions have caused and will continue to cause damage to the general public.

93.     Defendants willful and wanton actions have caused, and will continue to cause, damage to the City, including but not limited to unreimbursed expenses and costs incurred in an effort to mitigate and avoid damage to the general public caused by the conditions at and around the Site.

WHEREFORE, the City prays for judgment in its favor and against Defendants as follows:

A.     For injunctive relief restraining and enjoining the Defendants from allowing Solid Waste to be disposed at and around the Site, including City owned property, and compelling Defendants to take any and all actions necessary to abate conditions at and around the Site, and other conditions injurious to the general public;

B.     For an award of compensatory and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

31

C. For an award of punitive damages against the Defendants in an amount

deemed appropriate by this Court; and

D. For such further relief as this Court deems appropriate.

Dated:  May 21, 2023

         The City of Aurora

         By:  /s/ Jeffery D. Jeep 
            One of its Attorneys

Jeffery D. Jeep (ARDC No. 6182830)
Jeep & Blazer, L.L.C.
111 W. Chicago Avenue, #100
Hinsdale, IL 60521
(630) 537-1582
jdjeep@enviroatty.com

32