IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CITY OF AURORA, an Illinois municipal corporation,

          Plaintiff/Counter-Defendant,

        v.

GET GREEN RECYCLING INC., GGR
REAL ESTATE, LLC, GET GREEN
APPLIANCE RECYCLING LLC, DIMCO
GGR, LLC, DANIEL R. MYERS,
ANTHONY J. MEYERS, JAMES P.
MEYERS, and MICHAEL B. MEYERS,

          Defendants/Counter-Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 23 C 3187

Judge Joan H. Lefkow

## OPINION AND ORDER

The City of Aurora (the City) brings this action against Get Green Recycling Inc., GGR

Real Estate, LLC, Get Green Appliance Recycling LLC, DIMCO GGR, LLC, Daniel R. Myers,

Anthony J. Meyers, James P. Meyers, and Michael B. Meyers.[1] (Dkt. 1.) The City seeks

declaratory, injunctive, and monetary relief based on six counts: improper disposal of solid waste

in violation of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901, *et seq*.

(Count I); release of hazardous substances into the environment in violation of the

Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA),

42 U.S.C. §§ 9601, *et seq*. (Count II); discharge of pollutants without a permit in violation of the

Clean Water Act (CWA), 33 U.S.C. §§ 1251, *et seq*. (Count III); trespass of City-owned property

---

[1] This court has jurisdiction over the City's RCRA, CERCLA, and CWA claims under 28 U.S.C. § 1331, via 33 U.S.C. § 1365 and 42 U.S.C. §§ 6972(a), 9607(a), and 9613(g)(2), and over the City's state-law claims under 28 U.S.C. § 1367. Prior to initiating this suit, the City served the required Notices of Intent to Sue on defendants and the relevant government officials. (Dkt. 1 at 2, 20, 25.)

(Count IV); private nuisance to City-owned property (Count V); and public nuisance to the City and the public (Count VI). Defendants counterclaim, seeking contribution from the City for any violations of CERCLA (Counterclaim Count I), as well as injunctive and monetary relief for private nuisance caused by the City on defendants' property (Counterclaim Count II), for public nuisance caused by the City (Counterclaim Count III), and for the City's negligence in failing to remediate contamination on City property (Counterclaim Count IV).

Two motions are before the court. Defendants move to dismiss Count III for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Dkt. 20.) The City moves to dismiss Counterclaim Count I for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 27.) For the reasons discussed below, defendants' motion to dismiss Count III is denied and the City's motion to dismiss Counterclaim Count I is granted in part and denied in part, with leave to amend.

## **BACKGROUND**

Since at least 2011, defendants have run a scrap-metal recycling operation at a site located at 540 and 600 North Broadway Avenue in the City of Aurora (the Site).[2] (Dkt. 1 ¶¶ 16–17, 19.)[3] A number of City-owned properties—including 512 North Broadway Avenue (Kane County tax parcel 15-22-201-001), 610 North Broadway Avenue (Kane County tax parcel 15-15-

---

[2] Defendants Get Green Recycling and GGR Real Estate began scrap-metal recycling operations at the Site as late as April 2011. (Dkt. 1 ¶ 42.) Defendant Get Green Appliance Recycling joined those operations in February 2016. (*Id.* ¶ 43.) Defendant DIMCO joined in October 2019. (*Id.* ¶ 44.) The individual defendants have ownership or membership interests in these companies and have been involved, to one degree or another, in the management and decision-making at these companies. (*Id.* ¶¶ 45–51, 77–89.) Although defendants originally leased the properties on which the Site is located, defendants became owners of the properties in 2016. (*Id.* ¶¶ 52–55.)

[3] The City numbers the paragraphs in its Complaint in a somewhat unusual manner. Paragraphs 1–89 are common allegations to all counts, but then the first substantive paragraph in each count begins with ¶ 90. As a result, the court cites to count-specific allegations by specifying which count the paragraph belongs to. (*E.g.* dkt. 1, Count I ¶ 90.)

451-029), and 45 East Pierce Street (Kane County tax parcel 15-15-451-034), as well as Pierce Street and North Broadway Avenue themselves—adjoin the Site. (*Id.* ¶¶ 16, 58.) The Fox River runs just to the West of the Site. (*Id.* ¶ 15, 56, 66.) These graphics, attached to the complaint, give the general idea:



*Subject Property*





(Dkt. 1-1 at 18, 20.)

According to the City, "piles of scrap metal and other Solid Waste have continuously been stockpiled, stored, or disposed of at the Site" at least since 2011, and the scrap-metal recycling operations "have released large quantities of dust, metal fines, residual particulate matter and solid waste that [have] been allowed to accumulate" into a two- to five-inch layer. (Dkt. 1 ¶¶ 20–24, Count I ¶¶ 95–96.) In addition, a vast array of "solid, toxic, or hazardous" wastes have been disposed of at the Site.[4] (*Id.* ¶ 25.)

In November 2022, acting pursuant to an administrative search warrant and on behalf of the City, representatives of Carlson Environmental and JJW Engineering inspected the Site and collected soil samples, an analysis of which confirmed that scrap-metal operations there "have caused the disposal of Solid Waste … and soil contamination" that exceeds standards set by the Illinois Environmental Protection Agency (IEPA). (*Id.* ¶¶ 12–13, 72–75.) Not only have these

---

[4] Because the specific wastes and hazardous substances alleged to have been disposed are not relevant for the purposes of deciding these motions, the court does not include the City's exhaustive list (dkt. 1 ¶ 25) in this opinion.

wastes and substances contaminated the soil at the Site, but they have also migrated, in part via contaminated stormwater, onto adjacent City properties, into the City's storm sewer and "unimproved stormwater channels," and into the Fox River. (*Id.* ¶ 56, 69, Count I ¶¶ 93–94, Count IV ¶¶ 90–91.) Defendants have never applied for or obtained a permit required by the National Pollutant Discharge Elimination System (NPDES), 33 U.S.C. § 1342. (*Id.* ¶¶ 4, 8, 11, 59–60, 62, 70.) Nor have they ever submitted a Notice of Intent to be covered under the City's own NPDES permit, General Permit ILR00. (*Id.* ¶¶ 61, 70.)

According to defendants, the City has also released, and continues to release, hazardous substances at the City-owned properties that form part of the area designated by the City as the relevant "facility." (Dkt. 30 Counterclaim ¶¶ 2, 6–13.) Specifically, the City has been aware, since at least 1996, that 45 East Pierce Street suffers from "extensive contamination" in excess of established standards.[5] (*Id.* ¶¶ 14, 19, 23.) Some of this contamination may be attributable to the City's dumping of excavated soils and construction debris at 45 East Pierce Street, where those soils and debris have been "exposed to the elements." (*Id.* ¶¶ 20–21.) That exposure "to wind, precipitation, and flood conditions" has caused, or threatens to cause, "hazardous substances to migrate on, into, and under adjacent properties and the surrounding environment." (*Id.* ¶¶ 21, 24.) As recently as 2017, the IEPA had rejected a City proposal to remediate the contamination at 45 East Pierce Street, and the City has neither repaired the deficiencies in its proposal nor undertaken efforts to remediate. (*Id.* ¶¶ 25–27.) The City has likewise been aware of environmental contamination that exceeds established standards at 512 North Broadway Avenue since at least 1992. (*Id.* ¶¶ 28, 32.) That contamination has "infiltrated the soil, groundwater,

---

[5] Although defendants identify numerous specific contaminants that may be present at 45 East Pierce Street, as well as at 512 North Broadway Avenue (discussed below), the court need not list them here as they are irrelevant to the resolution of these motions. (Dkt. 30 Counterclaim ¶¶ 17, 30.)

surface water, and air" at the property and threatens to migrate onto adjacent properties and the surrounding environment. (*Id.* ¶ 38.) As recently as 2014, the IEPA notified the City that it had failed to remediate the contamination "in a timely and appropriate manner." (*Id.* ¶ 36.) Additionally, defendants also allege that the City "contracted, agreed, or otherwise arranged" to have defendants "dispose" of solid waste and hazardous substances at defendants' Site. (*Id.* ¶¶ 39–43, 45, 59–60, 63–64.)

## LEGAL STANDARDS

### I. Motion to Dismiss Under Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge the court's subject-matter jurisdiction. As the party seeking to have its case heard in federal court, the plaintiff "bears the burden of demonstrating that the district court has subject-matter jurisdiction over [the] case[.]" *Thornley* v. *Clearview AI, Inc.*, 984 F.3d 1241, 1244 (7th Cir. 2021) (citing *Schur* v. *L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009)). If the court determines that it lacks subject-matter jurisdiction, then "the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### II. Motion to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint to state a claim upon which relief may be granted. *See McReynolds* v. *Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 n.4 (2012). To withstand such a challenge, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556

U.S. at 678. A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable[.]" *Twombly*, 550 U.S. at 556. When ruling on a 12(b)(6) motion, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Hughes* v. *Nw. Univ.*, 63 F.4th 615, 630 (7th Cir. 2023). A complaint "need not allege each evidentiary element of a legal theory to survive a motion to dismiss." *Freeman* v. *Metro. Water Reclamation Dist. of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019) (citing *Swierkiewicz* v. *Sorema, N.A.*, 534 U.S. 506, 510–14 (2002)). But neither legal conclusions masquerading as factual allegations, *see Papasan* v. *Allain*, 478 U.S. 265, 286 (1986) (courts "not bound to accept as true a legal conclusion couched as a factual allegation"), nor "a formulaic recitation of the elements" of a claim, *Twombly*, 550 U.S. at 555, will suffice under Federal Rule of Civil Procedure 8(a)(2) ("A pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief[.]").

## ANALYSIS

### I.     Defendants' Motion to Dismiss the City's CWA Claim

Defendants move to dismiss the City's Clean Water Act claim (alleged in Count III of the complaint) for lack of subject matter jurisdiction. Specifically, defendants argue that (1) the City lacks standing to bring the CWA claim because "the City suffered no injury in fact" from the "alleged stormwater discharges to the Fox River" and (2) the CWA claim is barred because the City failed to give defendants adequate notice before initiating this suit, as required by 33 U.S.C. 1365(b). (Dkt. 21 at 4, 9.) Because standing is "the irreducible constitutional minimum" without which a plaintiff cannot proceed in federal court, *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560 (1992), the court first addresses standing before reaching the issue of notice.

A.     **Standing**

To bring a case in federal court, a plaintiff must have "a 'personal stake' in the case." *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines* v. *Byrd*, 521 U.S. 811, 819 (1997)) (cleaned up). At its core, standing requires that a plaintiff have suffered, or be likely to suffer, an "injury in fact." *Lujan*, 504 U.S. at 560. To establish standing, a complaint must plausibly allege "an injury that (1) is concrete and particularized, (2) was or will be caused by the defendant, and (3) likely will be remedied by a favorable judgment." *Brown* v. *Kemp*, --- F.4th ----, 2023 WL 7489920, at *8 (7th Cir. 2023) (citing *Lujan*, 504 U.S. at 560–61).[6] Where a party alleges a future injury and seeks a forward-looking remedy, such as an injunction, it is not enough that the prospective injury be "possible"; rather, there must be a "substantial risk" that the injury will come to pass. *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013) (citations omitted); *Swanigan* v. *City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) ("Because an injunction is a forward-looking remedy, a plaintiff seeking this form of relief has standing to sue for an alleged injury only if 'the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'") (quoting *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014)). Standing must be established for each claim a party brings, *see DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 352 (2006); *Johnson* v. *Office of Pers. Mgmt.*, 783 F.3d 655, 661 (7th Cir. 2015), and each standing element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof," *Lujan*, 504 U.S. at 561. In other words, "the manner and degree of evidence required" to establish standing to bring a claim tracks the usual burdens imposed on parties "at the successive stages of litigation." *Id.*

---

[6] To be concrete, an injury need not be tangible, but it must be "real, and not abstract." *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 340 (2016) (cleaned up). To be particularized, "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

Defendants argue that the City has not established the standing elements necessary to pursue its Clean Water Act claim. (Dkt. 21 at 3.) "The sole basis" for the City's Clean Water Act claim, they say, "is a generic, conclusory allegation that the 'CWA Violations may endanger the water quality of the Fox River on which the City of Aurora, other communities and their residents depend for potable water and for use as a natural resource for fishing, recreation and other activities.'" (*Id.* (quoting Dkt. 1 ¶ 26).) Defendants label this allegation a "barren hypothetical," insufficient to establish standing because "there is no plausible risk to the City's drinking water system" since "the City's drinking water intake is located three quarters of a mile upstream (*i.e.*, against the river current) of Get Green, making it impossible to trace any alleged contamination to Get Green." (*Id.* at 2–3.) In short, defendants argue that the City has not suffered any injury traceable to their conduct.[7]

In response, the City argues that it has standing to pursue its Clean Water Act claim by way of its trespass claim, for which standing is not in dispute. (Dkt. 26 at 2.) While "the full extent of the City's proprietary interests" in the Fox River could establish standing, the City says, this court need not consider those interests because the City's "garden variety trespass" claim alone satisfies Article III. (*Id.* at 2.) Citing to the Eleventh Circuit's decision in *Parker* v. *Scrap Metal Processors, Inc.*, 386 F.3d 993 (11th Cir. 2004), the City argues that it is enough that "contaminated stormwater" has or is "contaminating City owned property, which includes City owned sanitary and storm sewers," and that "scrap metal operations" have or are "being conducted on City owned property." (*Id.* at 5.) As a result of these actions, the City says,

---

[7] Defendants also argue that "the City cannot sue on behalf of the interests of other communities or recreational interests of its residents." (Dkt. 21 at 3.) Since the City does not argue otherwise—that it has standing based on injuries to others—the court does not address this line of argument.

"contamination mak[es] its way to the Fox River," and that contamination can be traced to defendants' "failure to obtain and comply with an NPDES permit." (*Id.*)

The court agrees with the City. In *Parker*, the plaintiffs' property adjoined the defendants' scrap-metal yard. 386 F.3d at 1000. Acting without an NPDES permit, the defendants allowed contaminated stormwater and solid wastes to migrate onto the plaintiffs' property and into an adjacent stream. *Id.* at 1002–04, 1009. The plaintiffs sued under several common law theories, including trespass, and for violations of the CWA and RCRA. *Id.* at 1000. On appeal from a jury verdict finding the defendants liable on all counts, the defendants argued that the plaintiffs lacked standing to pursue their federal statutory claims. *Id.* at 1002–04. The Eleventh Circuit rejected their arguments:

> [Plaintiff] demonstrated an injury-in-fact by showing that water runoff originating on the defendants' property caused hazardous substances, such as PCBs and lead, to migrate onto the [plaintiffs'] property, where the substances contaminate the soil and eventually made their way to the stream. This injury is fairly traceable to the defendants' alleged failure to obtain or comply with their National Pollutant Discharge Elimination System ("NPDES") permit. A favorable decision on the merits would adequately redress Mrs. Parker's injury because such a decision would require the defendants to obtain and comply with the required permit.

*Id.* at 1003–04.

The relevant facts here are on all fours with those in *Parker*. Defendants operate a scrap-metal yard that adjoins the City's property. (Dkt. 1 ¶¶ 17–18, 58, 76.) Acting without an NPDES permit, defendants have allegedly allowed solid debris and contaminated stormwater to migrate onto the City's property and into the adjacent Fox River. (*Id.* ¶¶ 18, 56–57, 59–62, 66, 76, Count IV ¶¶ 90–92.) Such allegations were sufficient for the Eleventh Circuit in *Parker*, and upon careful consideration, the court finds them sufficient to confer standing in this case.[8] This is not

---

[8] Even if it were entitled to greater deference or weight than the Eleventh Circuit's decision in *Parker*, the district court decision in *Kopacz* v. *Hopkinsville Surface & Storm Water Utility*, on which defendants rely, fails to persuade the court otherwise. In *Kopacz* the plaintiffs sought to establish standing

to say, as the City seems to argue, that anyone asserting a "garden variety trespass" claim would also have standing to bring a claim under the CWA. Proximity matters. Here, as in *Parker*, the trespassed property is adjacent to the contaminated waterway, which is itself only a short distance from defendants' property. (Dkts. 1 ¶¶ 16, 56, 66; 1-1 at 18, 20.) Likewise, as in *Parker*, the defendants have allowed contaminated stormwater to trespass on adjoining real estate en route to a nearby waterway. (*Id.* ¶¶ 18, 56–57, 66, 76, Count IV ¶¶ 90–92.) These are salient facts that are—at least in *Parker* and in this case—relevant to standing's particularization and traceability requirements. Because the contaminated stormwater passes over the City's property before being deposited in the directly adjacent Fox River, defendants' conduct affects the City "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. And because defendants' property, the City's property, and the Fox River are in relatively close proximity to one another, there are no weak links in the causal chain that begins with defendants' failure to obtain and comply with an NPDES permit and ends with the contamination of the Fox River. As a result, the City has standing to bring its CWA claim.

The City also argues that it has standing based on its own reporting obligations under the IEPA. (Dkt. 26 at 5–6.) Because "the City is obligated under its IEPA-issued General MS4 Permit,[9] a specific type of NPDES permit, to detect and eliminate illicit discharges," including any discharges not made pursuant to an NPDES permit, defendants' unpermitted discharge of contaminated stormwater means that the City could be "subject to enforcement actions and

---

to bring a CWA claim against the owners and operators of a property adjoining their own solely on the grounds that they had suffered an informational injury stemming from the defendants' failure to obtain an NPDES permit. 714 F. Supp. 2d 682, 684–85, 689 (W.D. Ky. 2010). Plaintiffs did not allege—and argued that they did not need to allege—that "their property was flooded in order to satisfy the requirements of standing." *Id.* at 689. With no claim of trespass, *Kopacz* is simply inapposite.

[9] MS4 stands for "municipal separate storm sewer system." (Dkt. 26-1 at 3.)

11

penalties if it were to submit a false or inaccurate application or report to the IEPA" or "failed to comply with its permit." (*Id.* at 5–6.) Because the City has standing to bring its CWA claim via the trespass theory, however, the court elects not to consider the City's alternative reporting-obligation theory.

### B.     Notice

Next, defendants argue that the City failed to provide the required statutory notice before initiating their CWA suit. The CWA's citizen-suit provisions include a notice requirement: "Sixty days before initiating a citizen suit, … the would-be plaintiff must give notice of the alleged violation to the EPA, the State in which the alleged violation occurred, and the alleged violator." *Friends of the Earth, Inc.* v. *Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 174–75 (2000) (citing 33 U.S.C. § 1365(b)(1)(A) ("No action may be commenced … prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]")). "The purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus render unnecessary a citizen suit." *Id.* at 175 (quoting *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60 (1987)) (cleaned up). Regulations issued by the Environmental Protection Agency provide guidance on the necessary contents of the notice:

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. 135.3(a). "In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit." *Atl. States Legal Found., Inc.* v. *Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997).

Defendants argue that the City here provided inadequate notice because (1) the City seeks a declaratory judgment that defendants are in violation of ILR001780 and the Stormwater Pollution Prevention Plan (SWPPP), neither of which was mentioned in the City's Notice of Intent to Sue (NOITS), and (2) the City made "sweeping, generalized, and unsupported allegations about hypothetical pollutants," rather than specific allegations about specific pollutants, in its NOITS. (Dkt. 21 at 9–13.) With respect to the alleged lack of specificity in the NOITS, defendants particularly take issue with the City's reliance in its NOITS on an EPA "Scrap Metal Fact Sheet," which lists solid wastes and pollutants that are produced "inherent[ly] in scrap metal recycling operations." (Dkt. 1-1 at 10-11; *see also* dkt. 21 at 10–13; dkt. 34 at 6.)

The City does not respond to the first argument—that the City cannot now seek a declaration that defendants are in violation of ILR001780 and the SWPPP where the NOITS made no mention of these. An examination of the NOITS, however, yields mixed results for defendants. The NOITS makes no reference to ILR001780, but it does explicitly refer to the SWPPP. (Dkt. 1-1 at 11.) The NOITS states that the preparation and implementation of an SWPPP are required by both the CWA and General Permit ILR00, and the NOITS alleges that defendants are in violation of both the Act and the General Permit. (*Id.* at 4, 11.) These allegations are sufficient to put defendants on notice that they could be sued for failure to comply with the SWPPP. The court finds, however, that the NOITS did not put defendants on notice that they might be charged with violating ILR001780. That said, the remedy for that notice failure is

not, as defendants suggest, to dismiss Count III in its entirety. Rather, in the absence of an amended complaint, the remedy is to bar the City from seeking a declaratory judgment that defendants have violated ILR001780. Because the City put defendants on notice, however, that it might sue them for violations of ILR00, the SWPPP, and Sections 301 and 402 of the CWA, *see* 33 U.S.C. §§ 1311, 1342, the City may continue to pursue declaratory relief related to those alleged violations.

With respect to the level of specificity contained in the NOITS, the City does not address defendants' arguments regarding alleged failures to identify specific pollutants. Instead, the City argues that its NOITS adequately notified defendants that they were in violation of the CWA in failing to apply for and obtain an NPDES permit. (Dkt. 26 at 6–7.) The parties are talking across each other. "The key to notice is to give the accused company the opportunity to correct the problem." *Atl. States Legal Found., Inc.*, 116 F.3d at 820. Defendants see "the problem" as the introduction of specific pollutants into the environment. In contrast, the City sees "the problem" as the failure to obtain and comply with an NPDES permit, which would allow or prohibit the release of those pollutants. Regardless, however, of whether the problem relates to permitting or pollutants, the City gave defendants adequate notice.

Again, adequate notice "shall include sufficient information to permit the recipient to identify the specific [effluent] standard, limitation, or order alleged to have been violated[.]" 40 C.F.R. 135.3(a). An "effluent standard or limitation" is defined, in part, as "an unlawful act under subsection (a) of section 1311" of the CWA. 33 U.S.C. § 1365(f). Under Section 1311(a), "[e]xcept as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). Section 1342 in turn creates a permitting scheme such that "it is illegal for anyone to

discharge pollutants into the Nation's waters except pursuant to [an NPDES] permit." *City of Milwaukee* v. *Illinois & Michigan*, 451 U.S. 304, 310–11 (1981). Put simply, discharging any pollutant into a navigable waterway *without a permit* is an unlawful act, a violation of an effluent standard or limitation.

There is no question that the City's NOITS put defendants on notice that they could be sued for failing to apply for, obtain, and comply with the mandatory NPDES permit. The NOITS (1) references the NPDES in defining the CWA, (2) notes that an NPDES permit "is *required* by Section 1342 of the CWA," and (3) repeatedly alleges that defendants have been conducting scrap-metal operations "*without* an NPDES permit." (Dkt. 1-1 at 6–12 (emphasis added).) To the extent, therefore, that the City brings Count III on the basis of this permitting violation, the City has satisfied the CWA's notice requirement.

Turning to defendants' argument that the NOITS was insufficiently specific regarding pollutants, the court is unconvinced that the NOITS made "sweeping, generalized, and unsupported allegations about hypothetical pollutants." (Dkt. 21 at 11.) The NOITS listed a number of specific contaminants—antimony, chromium, iron, lead, mercury, nickel—that had been identified in soil samples from defendants' property and alleged that stormwater flows from the location of those samples onto City-owned property and into the Fox River. (Dkt. 1-1 at 8–9.) The NOITS also referenced, as defendants point out, the EPA's Scrap Metal Fact Sheet, which lists a number of pollutants—magnesium, cadmium, zinc, chromium, lead, nickel, mercury, and arsenic—that are released into the soil when scrap metal corrodes (*id.* at 10), but the City did not rely solely on the Fact Sheet to allege the presence and release of such pollutants. Rather, the City combined the information from the Fact Sheet with the soil-sample analyses to allege that

15

more contaminants than those found in the soil samples are being discharged into stormwater and

migrating to the Fox River:

> In addition to the contaminants listed in [the soil sample analysis], and because
> the scrap metal operations at the Site involve some or all of the activities
> described in the USEPA Scrap Metal Fact Sheet, on information and belief, the
> contaminants released into stormwater at the Site include, by way of example, the
> following:
>
> a. The sediments and dissolved chemicals that have a high chemical
>    oxygen demand;
> b. Nitrogen;
> c. PCBs;
> d. Metals not listed in [the soil sample analysis] (e.g., arsenic);
> e. Oil and grease that is released by the machinery that is used at the Site,
>    including trucks, lifts, cranes, shredders, metal cutters and presses; and
> f. Hazardous materials that are spilled at the Site, including, oils,
>    solvents, petroleum, fuel, coolants, and hydraulic fluids.

(*Id.* at 11.) Moreover, the contaminants listed in the Fact Sheet are not, contrary to defendants'

assertion, "hypothetical." (Dkt. 21 at 10.) The Fact Sheet relates facts based on the EPA's

findings regarding scrap-metal operations generally. (Dkt. 1-1 at 9–10.) *See* 60 Fed. Reg. 50952–

50970. That all the contaminants identified by the EPA might not be found at every scrap-metal

site does not make them merely "hypothetical contaminants." (Dkt. 21 at 10.) Putting all this

together, there is simply no reason to accept defendants' contention that the NOITS put them on

notice only of "dust and silt" at their scrap-metal operations. (*Id.*)

    In sum, the City has standing to bring its CWA claim (Count III) and provided defendants

with sufficient notice before initiating this suit. This is not to say that defendants cannot later

claim inadequate notice if the City seeks to prove a violation not specified in the notice, but at

this stage in the litigation, defendants' notice argument is not persuasive.

## II.     The City's Motion to Dismiss Counterclaim Count I

Defendants assert a counterclaim (Count I) against the City for contribution for any violations of CERCLA for which defendants may be found liable. (Dkt. 30 at 57–62.) CERCLA's contribution provision states that "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title."[10] 42 U.S.C. § 9613(f)(1). Persons who are "liable or potentially liable" include:

(1) the owner or operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance … .

42 U.S.C. § 9607(a)(1)–(4).

Defendants here seek contribution from the City on two theories of liability: *first*, that the City may be liable as an "owner or operator" under subsection (a)(1), and *second*, that the City may be liable as an "arranger" under subsection (a)(3). (Dkt. 30 at 57–61.) The City moves to dismiss the counterclaim for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6).[11] (Dkt. 27.) The City argues (1) that defendants'

---

[10] Both the City and the defendants are "persons" under CERCLA. *See* 42 U.S.C. § 9601(21).

[11] The City moved to dismiss (dkt. 27) in response to defendants' original answer to the City's complaint (dkt. 22). After the motion to dismiss was filed, defendants filed an amended answer. (Dkt. 30.) Because there are no substantive differences between defendants' original and amended pleadings of Counterclaim I (dkt. 44 at 1 n.1), the court construes the City's motion to dismiss as responsive to defendants' amended, and operative, answer.

allegations relating to owner liability are conclusional, merely reciting the elements of the claim, and (2) that defendants have failed plausibly to allege "intentional disposal," a required element for a claim of arranger liability. (Dkt. 28 at 1, 5.) The court considers these objections as they apply to both theories of liability advanced by defendants.

A.    **Owner-Operator Liability**

Owner-operator "liability attaches when a plaintiff establishes that: (1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) the plaintiff has incurred costs in response to the release or threatened release." *Sycamore Indus. Park Assocs.* v. *Ericsson*, 546 F.3d 847, 850 (7th Cir. 2008). The City focuses on the third and fourth elements, arguing that defendants have failed adequately to plead that the City has released or threatened to release any hazardous substances onto defendants' Site and that hazardous substances on City properties have caused, or will cause, defendants to incur response costs at the Site. (Dkt. 28 at 5–6.)

Defendants respond first by contending that the City misapprehends the elements of an owner-operator CERCLA claim. (Dkt. 44 at 11.) Specifically, defendants challenge the City's apparent assumption that they must allege (1) "the potential for offsite migration," (2) that hazardous substances from City properties have migrated *toward* defendants' Site, and (3) that defendants' have incurred response costs *caused by* the City's release of hazardous substances. (*Id.* at 11, 14.) Defendants also argue that, even if these allegations must be made, they have adequately pleaded them. (*Id.* at 12–15.) Before analyzing whether defendants have plausibly alleged owner-operator liability, the court addresses these threshold disputes of law.

18

### 1.     *Offsite Migration & Migration Toward Defendants' Site*

The third element of owner-operator liability requires that "there has been a release or there is a threatened release of hazardous substances[.]" *Sycamore Indus. Park Assocs.*, 546 F.3d at 850. The question is whether the term "release" includes migration of hazardous substances beyond the owner-operator's site or toward another site. With certain specified exceptions not relevant here, CERCLA defines "release" as

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)... .

42 U.S.C. § 9601(22). Nothing in the statutory language explicitly requires offsite or directional migration for an act to qualify as a "release," and although one might discern such a requirement in the phrase "into the environment," CERCLA's definition of "environment" defeats such a reading. CERCLA defines "environment" as

> (A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson-Stevens Fishery Conservation and Management Act, and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.

42 U.S.C. § 9601(8). In short, nothing in CERCLA's text suggests that the relevant "environment" exists only outside the confines of the potentially offending site. The court therefore holds that neither off-site migration of hazardous substances nor migration of hazardous substances toward the contribution claimant's site is necessary for owner-operator liability to attach. *Accord Dedham Water Co.* v. *Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1154 (1st Cir. 1989) ("There is nothing in the statute, its legislative history, or the case law, which requires proof that the defendant's hazardous waste actually have migrated to plaintiff's

property, causing contamination of plaintiff's property, before CERCLA liability is triggered.");

*Am. Nat'l Bank & Trust Co.* v. *Harcros Chemicals, Inc.*, 997 F. Supp. 994, 998 (N.D. Ill. 1998)

(rejecting argument that CERCLA requires release or threat of release from offending site to

claimant's site); *NutraSweet Co.* v. *X-L Engineering Corp.*, 933 F. Supp. 1409, 1420 (N.D. Ill.

1996) (same).

### 2. *Causation*

The fourth element of owner-operator liability requires that "the plaintiff has incurred

costs in response to the release or threatened release" of hazardous substances. *Sycamore Indus.*

*Park Assocs.*, 546 F.3d at 850. The question is whether the plaintiff's response costs must have

been "caused" by the defendant's release of such substances. Again, the analysis begins with

CERCLA's text, which imposes liability for

>    (A) all costs of removal or remedial action incurred by the United States Government or
>        a State or an Indian tribe not inconsistent with the national contingency plan;
>    (B) any other necessary costs of response incurred by any other person consistent with
>        the national contingency plan;
>    (C) damages for injury to, destruction of, or loss of natural resources, including the
>        reasonable costs of assessing such injury, destruction, or loss resulting from such
>        release; and
>    (D) the costs of any health assessment or health effects study carried out under section
>        9604(i) of this title.

42 U.S.C. § 9607(a)(4)(A)–(D). Nothing in this provision requires causation. Nor is causation

required by CERCLA's citizen-suit provision, which allows, in relevant part, "any person" to

"commence a civil action on his own behalf … against any person … who is alleged to be in

violation of any standard, regulation, condition, requirement, or order which has become

effective pursuant to this chapter… ." 42 U.S.C. § 9659(a)(1). *See also Frey* v. *E.P.A.*, 751 F.3d

461, 463 (7th Cir. 2014).

Faced with the statute's silence, courts have split on the issue. The majority of courts have required that the plaintiff's response costs be caused by the defendant's offending release. *See*, *e.g.*, *Gen. Elec. Co.* v. *Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1417 (8th Cir. 1990) ("In order for a private party to recover [response] costs from the responsible party, the release of hazardous substances must have 'caused' the incurrence of the costs."), *cert. denied*, 499 U.S. 937 (1991). *Accord Dedham Water Co.*, 889 F.2d at 1154 ("[T]he issue is whether a release or threat of release caused 'response costs.'"); *Am. Nat'l Bank & Trust Co.*, 997 F. Supp. at 1000 (same); *NutraSweet Co.*, 933 F. Supp. at 1419–20 (referring to CERCLA's "fourth element" as "the 'causation' element"). The court is aware of only one case rejecting the causation element. *See Premium Plastics* v. *LaSalle Nat'l Bank*, 904 F. Supp. 809, 814–15 (N.D. Ill. 1995) (expressly declining to impose requirement that defendant's release caused plaintiff's response costs).[12]

These positions can be reconciled. As *Premium Plastics* recognizes, the "plain language of CERCLA supports the conclusion that a CERCLA plaintiff—government or private—need not prove a connection between the defendant's waste and the plaintiff's response costs." 904 F. Supp. at 815. The court agrees that the statute does not require a causal connection between release and costs. The statute does not, however, circumvent standing's requirement that the plaintiff's injury—the response costs—be "fairly traceable to the challenged action of the defendant[.]" *Lujan*, 504 U.S. at 560 (cleaned up). Thus, while CERCLA does not require

---

[12] The parties cite several other decisions which they believe speak to the issue of causation, but the cases address causation issues distinct from the one at issue here. *See Covalt* v. *Carey Canada Inc.*, 860 F.2d 1434, 1436 (7th Cir. 1988) (addressing causation under 42 U.S.C. § 9658, which relates to actions for damages, *e.g.*, personal injury, caused by release); *New York* v. *Shore Realty Corp.*, 759 F.2d 1032, 1043–44 (2d Cir. 1985) (addressing whether defendant must have caused release and concluding that strict liability applies).

causation, a plaintiff (or contribution claimant) must still show causation to bring an owner-operator claim in federal court.

### 3.      *Owner-Operator Liability in this Case*

Whether defendants have plausibly alleged a claim for contribution under an owner-operator theory of liability must begin with causation, since it is a constitutional, rather than a statutory, requirement. Defendants have met that constitutional burden at this stage of the litigation. Put broadly, defendants allege that the City has released, and continues to release, numerous hazardous substances into the environment at its City-owned properties adjoining defendants' site. (Dkt. 30 Counterclaim ¶¶ 2, 6–13.) These are the same City properties to which, the City alleges, defendants have allowed hazardous substances to migrate. (Dkt. 1 Count IV ¶¶ 90–95.) In fact, at least for purposes of the City's CERCLA claim, the City alleges that the relevant "facility," as CERCLA defines and uses the term, includes both the defendants' site and the adjacent City-owned properties. (*Id.* Count II ¶¶ 90–101.) If the City's CERCLA claim is successful, defendants will be liable for cleaning up this entire "facility." But if the City has, in fact, caused *some* of the contamination at the "facility," then the City will have caused defendants to incur response costs that include removal or remediation of contamination caused by the City. In other words, some part of defendants' injury—their response costs—will be "fairly traceable" to the City's release of hazardous substances.

Turning to the City's argument that defendants have failed plausibly to allege owner-operator liability because they have merely recited the elements of the claim (dkt. 28 at 1, 5), the court finds no merit in this argument. The City itself has defined the relevant "facility," which includes properties owned by the City. The first two owner-operator elements—that "the site in question is a 'facility' as defined by CERCLA" and that "the defendant is a responsible party"—

are therefore satisfied. *See Sycamore Indus. Park Assocs.*, 546 F.3d at 850. As to the third element, defendants' counterclaim provides numerous specific factual allegations indicating that "there has been a release or there is a threatened release of hazardous substances." *See id.* Defendants allege that the City has deposited "excavated soil and construction debris" at the "facility," that many volatile organic compounds, semi-volatile organic compounds, and metals have been released on those City-owned properties, and that these hazardous substances and "other regulated constituents" have been "exposed to the elements, including but not limited to wind, precipitation, and flood conditions." (Dkt. 30 Counterclaim ¶¶ 17, 20–24, 30–32, 38.) At the pleading stage, these allegations are sufficient plausibly to allege the "release or … threatened release of hazardous substances," satisfying the third owner-operator element. *See Sycamore Indus. Park Assocs.*, 546 F.3d at 850. Finally, as it is plausible defendants will incur response costs if the City's CERCLA claim is successful, the fourth element is satisfied. In short, defendants have plausibly alleged owner-operator liability against the City.

### B.    Arranger Liability

Defendants also argue that the City can be held liable for contribution as an "arranger" under Section 9607(a)(3). (Dkt. 30 at 57–61.) As relevant here, that section "applies to an entity that 'arrange[s] for disposal … of hazardous substances.'" *Burlington N. & Santa Fe Ry. Co.* v. *United States*, 556 U.S. 599, 609–10 (2009) (quoting 42 U.S.C. § 9607(a)(3)). Arranger liability undoubtedly attaches where an entity "enter[s] into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance." *Id.* at 610. Also clear is that arranger liability does not attach where an entity "sell[s] a new and useful product" that the purchaser "later, and unbeknownst to the seller, dispose[s] of … in a way that [leads] to contamination." *Id.* What is "[l]ess clear is the liability attaching to the many permutations of

'arrangements' that fall between these two extremes—cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the 'sale' of a hazardous substance are less than clear." *Id.* Considering the difficulty presented by such in-between cases, the Supreme Court has held that "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.* at 611. "Disposal" is defined by CERCLA as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29) (adopting definition of "disposal" in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3)).

Ultimately, whether arranger "liability attaches is a fact intensive" inquiry. *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 610. "[I]n some instances, an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes," but "knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Id.* at 612.

The City argues that defendants have failed plausibly to allege that the City *intentionally disposed* of any hazardous waste. (Dkt. 28 at 1, 5.) In support, the City relies heavily on a 2021 decision of this district court, *City of Aurora* v. *BS Iron, Inc.*, No. 20 C 5337, 2021 WL 3857790 (N.D. Ill. Aug. 30, 2021). (*See* dkt. 28 at 2–3.) There, the City of Aurora made a similar challenge to contribution claims, arguing that the contribution claimants had "fail[ed] to allege facts that allow a reasonable inference of the City's intent to dispose" of hazardous waste. *BS Iron*, 2021 WL 3857790 at *3. The court found that the allegations supporting the contribution

claims were "entirely" conclusional. *Id.* One claimant asked the court to infer intentional disposal from "the nature of the material the City brought to the Site and the small size of the payments it received in return for the materials." *Id.* As the court rightly noted, since the site in question was "alleged to have been a scrap metal recycling operation, not a landfill or a dump[,]" it would be "at least equally plausible" to infer from these allegations that "the City understood the material would be recycled, not disposed of." *Id.* Because of this "obvious alternative explanation," the court determined that the counterclaim fell "short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *McCauley* v. *City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)). Between that obvious alternative explanation and the complexity of the "underlying scenario" that might give rise to arranger liability, the court dismissed the counterclaims with leave to amend. *Id.*

Defendants argue that the allegations and arguments they make here are distinguishable from those in *BS Iron*. The allegations they have made, they say, are far from "threadbare," making it "more than plausible" that the City had the requisite "intent to dispose." (Dkt. 44 at 6–7.) Defendants believe the following allegations make that showing:

> On information and belief, the City and/or some of its departments contracted, agreed, or otherwise arranged with Get Green Recycling Inc. for the disposal of solid waste, including scrap metal. (Dkt. 30 Counterclaim ¶ 39.)

> On information and belief, the City and/or some of its departments have disposed of solid waste in a roll off container that is stationed at the City of Aurora Water and Sewer Department since at least 2019, or earlier, which continues to the present. (*Id.* ¶ 40.)

> On information and belief, the solid waste disposed of by the City with Get Green Recycling includes scrap metal, construction and demolition debris, fire hydrants, pipes, rebar, used sewer lines excavated from City projects, manhole covers, water meters, and other waste materials ("City Solid Waste"). (*Id.* ¶ 42.)

> On information and belief, the City also contracted, agreed, or otherwise arranged with Get Green Recycling to accept and dispose of solid waste from the

25

community, including, on information and belief, appliances such as cables, cable boxes, cameras, cash registers, cell phones, copiers, cords, DVD players, fax machines, keyboards, laptops, printers (and cartridges), projectors, radios, satellite dishes, stereos, typewriters, VCRs, video games; blenders, bread makers, carpet sweepers, coffee makers, clocks, curling irons, electric knives, electric toothbrushes, fans, fryers, hair cutters, hairdryers, heaters, holiday lights, irons, landline phones, metal tools, mixers, remotes, shaving equipment, toaster ovens, and vacuum cleaners ("Collection Waste"). (*Id.* ¶ 45.)

On information and belief, the City placed, dumped, and/or deposited City Solid Waste in roll off containers that Get Green Recycling would transport at the City's direction and request to Get Green Recycling, as well as directly in roll off containers at Get Green Recycling. (*Id.* ¶ 55.)

On information and belief, the City disposed of its unwanted City Solid Waste intending to rid themselves [*sic*] of the City Solid Waste with no expectation or agreement that the City Solid Waste be returned. The City Solid Waste no longer had use or value to the City for the purpose the waste materials were originally manufactured, used, or designed, and were no longer in a usable condition. The City Solid Waste was disposed of without cleaning, washing, or removing hazardous substances contained on or within them. (*Id.* ¶ 56.)

On information and belief, the City intended that City Solid Waste be disposed of by and at Get Green Recyling. (*Id.* ¶ 57.)

On information and belief, the City knew or should have known that the City Solid Waste contained CERCLA hazardous substances. (*Id.* ¶ 58.)

On information and belief, the City actively coordinated, directed, and controlled the placement, dumping, and/or disposition of Collection Waste for disposal by Get Green Recycling. (*Id.* ¶ 60.)

On information and belief, the Collection Waste disposed of was unwanted with no expectation or agreement that the Collection Waste be returned. The Collection Waste no longer had use or value for the purpose the waste materials were originally manufactured, used, or designed, and was no longer in a usable condition. (*Id.* ¶ 62.)

The City's website states that "Electronics are Prohibited Curbside" and "Electronics can contain hazardous or rare materials and are the largest growing segment of the waste stream. Because of this, Illinois state law prohibits residents from disposing of computers, monitors, printers, and other electronics in landfills. In addition, the City's curbside waste hauler will not take any prohibited item on your trash day." (*Id.* ¶ 63.)

On information and belief, the City arranged for disposal of Collection Waste containing hazardous substances intending to divert the Collection Waste and the hazardous substances within them to Get Green Recycling instead of the City's curbside pickup. (*Id.* ¶ 64.)

On information and belief, the City arranged for the disposal of waste containing hazardous substances at Get Green Recycling by organizing, directing, and managing electronic waste collection events and contracting, agreeing, or otherwise arranging with Get Green Recycling to dispose of Collection Waste. (*Id.* ¶ 65.)

These allegations simply cannot do the work defendants expect them to do. Contrary to defendants' arguments, these allegations are conclusory.[13] Alleging that the City arranged "for the disposal of solid waste" or has "disposed of solid waste" merely labels how the City has handled waste in CERCLA's own terms. Put another way, saying that the City "disposed" of waste is a legal conclusion that one might draw from factual allegations supporting that conclusion, but it is not a factual allegation in and of itself. *See Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 610 (recognizing the need for "a fact-intensive inquiry that looks beyond the parties' characterization of the transaction"). Nor do laundry lists of specific waste items help defendants sufficiently allege intentional disposal; the City may have intended that these items be disposed or recycled, but listing everything that the City transferred to defendants does not tip the scales one way or the other. Finally, alleging that the City "intend[ed] to rid" itself of waste or "intended" that defendants dispose of City waste does not plausibly allege an *intent to dispose* in a legal sense. That the City transferred waste material to defendants says nothing about the City's intent in doing so. In short, contrary to defendants' argument, the allegations here are just as conclusory as those in *BS Iron*. And, as in *BS Iron*, there is an "obvious alternative explanation," *Twombly*, 550 U.S. at 567, that the City meant for Get Green *Recycling* to recycle

---

[13] Although pleading "on information and belief" is not prohibited, one might assume that defendants should have actual knowledge of at least some of these allegations.

these solid wastes and hazardous substances rather than to dispose of them in a manner that would violate CERCLA. *See BS Iron*, 2021 WL 3857790 at *3 ("In fact an at least equally plausible inference … is that … the City understood the material would be recycled, not disposed of. Indeed, the Site is alleged to have been a scrap metal recycling operation, not a landfill or a dump."). As in *BS Iron*, the allegations therefore "fall 'short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *McCauley*, 671 F.3d at 616). Consequently, defendants have not stated a claim based on arranger liability.

## CONCLUSION AND ORDER

For the reasons discussed above, defendants' motion to dismiss Count III is denied and the City's motion to dismiss Counterclaim Count I is granted in part and denied in part. Defendants have stated a claim based on a theory of owner-operator liability. To the extent defendants also wish to rely on arranger liability, they are granted leave to replead or amend their counterclaim accordingly.

Date: January 9, 2024

_____
U.S. District Judge Joan H. Lefkow

28